In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 17-2847

ENTERTAINMENT USA, INC.,

*Plaintiff-Appellant*,

*v.*

MOOREHEAD COMMUNICATIONS, INC.,

*Defendant-Appellee*.

_____

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 12-CV-116 — **Robert L. Miller, Jr.**, *Judge*.

_____

ARGUED FEBRUARY 21, 2018 — DECIDED JULY 26, 2018

_____

Before RIPPLE, KANNE, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. In 2006, plaintiff Entertainment USA sold cellular telephones and service contracts in central Pennsylvania through a network of retail dealers. Defendant Moorehead Communications, an Indiana company, sought to break into that geographic market by offering dealers the chance to sell Verizon products and services. Without aid of counsel, the two companies signed a two-page "referral agreement" connecting Moorehead with a number of

Entertainment USA's dealers. The agreement promised Entertainment USA a "referral fee" for every Verizon activation or upgrade that resulted.

Six years later, this referral agreement became the subject of litigation in the Northern District of Indiana. Entertainment USA alleged that Moorehead breached the agreement by discontinuing the referral payments. After a bench trial, the district court agreed that Moorehead had breached, but in much narrower ways than Entertainment USA had claimed. The court also found, however, that Entertainment USA had failed to prove the amount of its damages with reasonable certainty. The court therefore awarded no damages to Entertainment USA. *Entertainment USA, Inc. v. Moorehead Communications, Inc.*, 2017 WL 3432319 (N.D. Ind. Aug. 9, 2017). We affirm.

I.   *Factual Background and Procedural History*

   A.  *The Referral Agreement*

This case is about selling cell phones. More specifically, it is about who sells cell phones. When a customer walks into a cellular telephone retail store, depending on the store, the customer may have a choice of wireless carrier service contracts with different companies (e.g., AT&T, T-Mobile, etc.), or the store may offer only one option (e.g., only Verizon or only Sprint). Whether the customer has a choice of carrier or not depends on the licensing status of the store owner and its wholesaler, and the licensing policies of the various carriers.

In 2006, plaintiff Entertainment USA—doing business as One Wireless World or "OWW," as the parties' documents sometimes called it—operated as a cell phone wholesaler and

licensor. It had a network of affiliated dealers and retail stores in central Pennsylvania.[1] At that time, the stores affiliated with Entertainment USA offered their customers service contracts through several different carriers, including AT&T, Sprint, and T-Mobile. Entertainment USA did not have a relationship with Verizon, however, so its stores could not offer customers Verizon service. Around this time, defendant Moorehead Communications, a Verizon master agent based in Indiana, sought to expand its presence in central Pennsylvania by signing up dealers and their stores with Verizon.

Entertainment USA had the kind of stores Moorehead sought to do business with, but Entertainment USA would probably lose out on some revenue from offering service through other carriers if its stores added Verizon to its lineup. So the parties made a deal: the referral agreement whereby Entertainment USA agreed to refer some of its stores to Moorehead for consideration as potential new Verizon locations. In return, Moorehead agreed to pay Entertainment USA a "referral bonus" for each new Verizon activation that eventually resulted from this arrangement, whether or not the referred stores continued to offer service with other carriers. Representatives for both sides worked together to draft a two-page contract formalizing this arrangement in January 2006, though neither side engaged counsel. The relevant portions of the referral agreement are as follows:

---

[1] The trade name One Wireless World was used by several related wireless wholesaling companies run at the time by brothers Chau and Chinh Nguyen. To minimize confusion, we use the plaintiff entity's name, Entertainment USA, to refer to all of the related entities on that side of the disputed referral agreement.

The proposed referral fee is designed to compensate OWW for location handoffs and offset loss incurred from adding another carrier to their Branded Store's existing lineup. This will also include any locations, other than the current list of Branded stores that are approved through Verizon and signed up under Moorehead Communications in the future that are referred directly to us by the OWW group.

Moorehead is proposing the following:

- For all handoffs / referrals from OWW, dating back to Jan 1, 2006 and any locations that are approved following that date as a direct result of an OWW referral, we will pay a referral bonus in the amount described below.

Monthly Activations for the referred group

*** 20$ per activation (New Activations Only) to assist with ramp up period which will remain in effect 6 months from the date this agreement is signed by both parties. After which, referral bonus will be adjusted to the appropriate tier. (See Below)

50-150 per month - 10$ referral bonus per activation
151-250 per month – 15$ referral bonus per activation
251-350 per month – 20$ referral bonus per activation

> 351-450 per month – 25$ referral bonus per
> activation
>
> 451-500 per month – 30$ referral bonus per
> activation
>
> 501 per month and higher – 35$ referral bonus
> per activation
>
> *There will be a flat fee of 10$ per 2 year
> upgrade in addition to items listed above.

Dkt. 1 at 7.

From early 2006 until sometime in 2008, Moorehead paid referral fees on a regular basis to Entertainment USA under this agreement. Though the agreement did not specifically define the term "activation," Moorehead paid referral fees for "two-year phone activations (new lines of service) and two-year upgrades"—the kinds of phone sales that entailed new two-year service contracts with Verizon. Though it also did not define "location," the agreement did include an initial list of referred locations, with the name of each store, its owner/operator, and its address or city. After Sprint required exclusivity from all of its wholesalers and dealers in late 2006, Entertainment USA referred several more stores to Moorehead—the stores that did not wish to become exclusive Sprint retailers. From 2006 to 2008, Moorehead paid $70,979.50 in referral fees with respect to six referred stores that sold Verizon products.

In 2008, Moorehead stopped paying referral fees to Entertainment USA, and around that time, Entertainment USA's "OWW group" of stores stopped selling Sprint products entirely. Chau Nguyen then started a new company and proposed a new referral agreement to Moorehead.

Moorehead declined. From 2009 to 2011, Chau Nguyen sent several more requests for commission reports and payments to Moorehead, to no avail.

B.  *The Lawsuit*

In April 2012, about four years after the payments stopped, Entertainment USA filed its complaint alleging a breach of contract, requesting an equitable accounting, and claiming unjust enrichment. Since "Moorehead has and continues to enjoy the fruits of" the plaintiff's referrals, the complaint alleged, Moorehead should have continued to pay referral fees under the contract. Moorehead agreed in part, as shown by two additional payments it made to Entertainment USA after the suit was filed, totaling $52,273.24. After tendering those additional payments, though, Moorehead answered the complaint and asserted that it had paid Entertainment USA in full. Given that the parties were citizens of different states litigating an amount in controversy estimated in the millions, federal jurisdiction was secure. See 28 U.S.C. § 1332(a). The parties agreed that Indiana contract law applied.

The parties filed cross-motions for summary judgment in 2014. *Entertainment USA, Inc. v. Moorehead Communications, Inc.*, 93 F. Supp. 3d 915, 922 (N.D. Ind. 2015). Judge Lozano resolved several of the disputed issues on summary judgment. He decided that the agreement's term "referred locations" meant only physical locations and not individuals and entities, *id.* at 924–25, 926, and decided that Entertainment USA's unjust enrichment claim had to be rejected as duplicative because it covered the same subject matter as a contract (the referral agreement), *id.* at 934–35. The rest of the issues, including questions about the duration of the

agreement, the precise meaning of the term "activations," and whether there were additional "directly referred" locations beyond a list stipulated to by Moorehead, remained for trial. *Id.* at 927, 930, 931–32.

The case was transferred to Judge Miller, who held a bench trial in August 2016 and set forth his findings in a thorough order. Judge Miller agreed with Entertainment USA that the parties "intended an agreement that would live on as long as any referred location was producing activations," though he sided with Moorehead that only two-year post-paid phone contracts counted as "activations." 2017 WL 3432319, at *6, *13. Since the agreement required fee payments from any "referred location," the district court went store-by-store to determine which of the many alleged stores were in fact referred by the plaintiff, settling on a list of twelve stores. *Id.* at *14.

Although the district court's findings on liability could have set up Entertainment USA to recover a significant portion of its requested damages, the district court saw a fundamental problem with the plaintiff's damages presentation: Entertainment USA "provides no help in identifying any difference between what was paid and what was due under the referral agreement as the court construes it." *Id.* at *15. In essence, the plaintiff presented a damages calculation aligned with its broad theories of liability, but it did not present an estimate or evidence that could, with reasonable effort, be disaggregated and recalculated in accordance with the district court's much narrower bases for finding liability. *Id.* Examining other exhibits in the record did not help the judge, since the plaintiff's "numbers differ frighteningly from the Moorehead records introduced into

evidence," and the plaintiff's numbers were purportedly based on six additional years of data *not* contained in the record. See *id*.[2]

Citing Indiana law, which requires a plaintiff to prove its breach of contract damages with reasonable certainty, see *R&R Real Estate Co. v. C&N Armstrong Farms, Ltd.*, 854 N.E.2d 365, 370–71 (Ind. App. 2006), the district court concluded:

> Even a reasonable estimate can't be achieved on this record. …. [Entertainment USA] hasn't proved that it was paid any less than it should have been. This record doesn't support a damages award in any amount.

2017 WL 3432319, at *16. Since the plaintiff had full use of the discovery process yet still failed to prove its damages with any certainty, the district court also denied an equitable accounting. *Id.* at *17. As a result, the district court ruled that "Entertainment USA, Inc. … shall take nothing by its complaint." *Id.* The plaintiff appeals that determination, as well as all of the other decisions that led to the district court's judgment, except for the dismissal of its unjust enrichment claim.

II. *Analysis*

  A. *Standard of Review*

Entertainment USA urges us to revisit all of the district court's many conclusions about how to interpret the contract,

---

[2] As seen above at 4–5, the per-activation referral fee depended in part on the per-month volume of the "referral group" of stores. That means that a correct calculation of the amount due would require analysis of all the data about all the relevant sales in all time periods.

its denial of an equitable accounting, and its critical finding on damages. We focus on the damages issue, which is sufficient to decide virtually all of this appeal. As we have said in other complex cases with fatal shortcomings of proof: "It is not always necessary to march through this entire process if a single issue proves to be dispositive." *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 473 (7th Cir. 2002) (declining to sort through all of the evidence of employment discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), when plaintiff failed to show pretext); *Harden v. Marion County Sheriff's Dep't*, 799 F.3d 857, 866 (7th Cir. 2015) (same). Here, that core issue is whether Entertainment USA met its burden in proving damages with reasonable certainty under Indiana law. See *National American Insurance Co. v. Artisan & Truckers Casualty Co.*, 796 F.3d 717, 723 (7th Cir. 2015) ("In diversity cases, we apply federal procedural law and state substantive law."), citing *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001); see generally *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).

We review the district court's decision on damages for clear error. *Advertising Specialty Institute v. Hall-Erickson, Inc.*, 601 F.3d 683, 688 (7th Cir. 2010) (applying Pennsylvania's "reasonable certainty" requirement for contract damages). We do not ask "what we would find were we sitting at the trial level." *Id.*, citing *Lever v. Northwestern University*, 979 F.2d 552, 553–54 (7th Cir. 1992), and *Jones v. Hamelman*, 869 F.2d 1023, 1031 (7th Cir. 1989). Instead, we "must affirm if the district court's account of the evidence is plausible" in light of the whole record, asking whether "a reasonable trier of fact could conclude that the proffered evidence falls short of proving damages with reasonable specificity." *Id.*; see also *Trustees of Chicago Painters & Decorators Pension, Health &*

*Welfare, & Deferred Savings Plan Trust Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 785 (7th Cir. 2007) ("In an appeal from a bench trial, we review a district court's conclusions of law de novo, and we review its findings of fact, as well as applications of law to those findings of fact, for clear error.") (cleaned up). As the Indiana courts have observed, the role of an appellate court in cases like this is to "focus upon the evidence in favor of the judgment and any reasonable inferences to be drawn therefrom." *Gigax v. Boone Village L.P.*, 656 N.E.2d 854, 857 (Ind. App. 1995), citing *K-Mart Corp. v. Beall*, 620 N.E.2d 700, 706 (Ind. App. 1993).

B. *Damages*

The "essential elements of any breach of contract claim are the existence of a contract, the defendant's breach thereof, and damages." *Old Nat'l Bank v. Kelly*, 31 N.E.3d 522, 531 (Ind. App. 2015), quoting *Holloway v. Bob Evans Farms, Inc.*, 695 N.E.2d 991, 995 (Ind. App. 1998); see also *Haegert v. University of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012) ("the plaintiff must prove … damages resulting from the breach"). Indiana contract law requires a plaintiff to prove its damages with reasonable certainty:

> In actions for breach of contract, damages must be proven with reasonable certainty. *Noble Roman's, Inc. v. Ward*, 760 N.E.2d 1132, 1140 (Ind.Ct.App.2002). While the plaintiff need not prove the amount of damages suffered to a mathematical certainty, the award must be supported by evidence in the record. [*Gigax*, 656 N.E.2d at 856.] A factfinder may not award damages on the mere basis of conjecture or speculation. *Noble Roman's*, 760 N.E.2d at [1140].

> As the party that had the burden of proving damages, R & R is appealing from a negative judgment. *See id.* Consequently, R & R must demonstrate that the damage award is clearly erroneous or contrary to law to have it set aside. *Id.*

*R&R Real Estate*, 854 N.E.2d at 370–71 (cleaned up).

This burden falls on the plaintiff because damages are an element of a breach of contract action—a plaintiff cannot recover anything without "proving with reasonable certainty the damages which he incurred" due to the breach. *Indiana Bell Tel. Co. v. O'Bryan*, 408 N.E.2d 178, 183 (Ind. App. 1980), citing *Daly v. Nau*, 339 N.E.2d 71 (Ind. App. 1975), and *Bond v. Snyder Construction Co.*, 234 N.E.2d 659 (Ind. App. 1968); see also *City of North Vernon v. Voegler*, 2 N.E. 821, 824 (Ind. 1885) ("In every valid cause of action two elements must be present, the injury and the damages. The one is the legal wrong which is to be redressed; the other, the scale or measure of the recovery.").

While seeking to recover "the benefit of the bargain," *Berkel & Co. Contractors, Inc. v. Palm & Assocs., Inc.*, 814 N.E.2d 649, 658 (Ind. App. 2004), a plaintiff may use any "proper evidence" to measure damages, see *Indianapolis City Market Corp., v. MAV, Inc.*, 915 N.E.2d 1013, 1024–25 (Ind. App. 2009), citing *Berkel & Co.*, 814 N.E.2d at 658. Trial testimony can support a decision on damages, as long as the evidence in total is "sufficient to enable the factfinder to make a fair and reasonable finding as to the proper damages." *Id.* at 1025, citing *Jerry Alderman Ford Sales, Inc. v. Bailey*, 291 N.E.2d 92, 106 (Ind. App. 1972). An award of damages must be "within

the scope of the evidence that was presented at trial" and cannot stray beyond that scope. *Id.* at 1026.

This means that to award damages at all, a judge finding a breach of contract after a trial must have enough reliable evidence available to support a damages award without resorting to speculation or conjecture. See *Vaughn v. General Foods Corp.*, 797 F.2d 1403, 1416 (7th Cir. 1986) (applying Indiana law). The "award must be supported by evidence in the record," or it is improper, *Gigax*, 656 N.E.2d at 856, though this analysis "does not require any particular degree of mathematical certainty" and "where there is doubt as to the exact proof of damages, such uncertainty must be resolved against the wrongdoer," *Stoneburner v. Fletcher*, 408 N.E.2d 545, 550 (Ind. App. 1980), citing *Friendship Farms Camps, Inc. v. Parson*, 359 N.E.2d 280 (Ind. App. 1977) and *Gene B. Glick Co. v. Marion Construction Corp.*, 331 N.E.2d 26 (Ind. App. 1975). Reasonable estimates are enough, as long as they are supported by a factual basis. See *id.* at 550–51 (upholding award where "a reasonably sound factual basis for the award [could] be found").

Entertainment USA's presentation of damages fell well short of this modest threshold. The presentation consisted of several demonstrative spreadsheets that summarized Moorehead's relevant account records, and calculated expected referral fees in accordance with the plaintiff's sweeping theory of liability, arriving at a total damages estimate of $2,282,550. See Dkt. 157–5; Dkt. 174–4 at 1. Chau Nguyen, who prepared this estimate himself, admitted in his trial testimony that he based his count of qualifying activations on appearances of generic terms like "NEWACT:" and "UPGR:" in Moorehead's account records, terms which

included many instances of non-compensable activity like dealer incentive payments, customer returns, and even upgrade *deactivations*. Dkt. 173 at 567–73. In response, Moorehead submitted its own summary of the relevant records matching its theory of the case, which estimated the total referral fees due to be $20,600—well below the amount Moorehead had already paid Entertainment USA. See Dkt. 175 at 6. Neither side's estimate contained citations to the docket or trial record, making verification of the underlying methods nearly impossible. Since the district court's liability findings did not accord with the assumptions built into any of these calculations, the parties, and especially the plaintiff, which had the burden of proof, left the court without reliable guidance in finding a supportable figure somewhere between $20,600 and $2.28 million.

Entertainment USA argues on appeal that the judge had all the information needed to re-calculate damages in accordance with his findings, and points out that the summary spreadsheets were provided in its written closing argument. See Dkt. 174 at 20–22; Dkt. 174–4. This argument vastly overstates the reliability, clarity, and usefulness of the plaintiff's presentation. The judge would have had to exclude rows of data that did not match the court's liability findings, then excise columns that also did not match, then select a new per-activation "referral bonus" amount from the sliding scale in the contract (despite not having a month-by-month breakdown of sales). Then the judge would have had to simply trust that the underlying counts of activations and upgrades were correct, despite Chau Nguyen's testimony that those counts were incorrect. No trial judge could (or should) have done what Entertainment USA urges here. It was not

error—let alone clear error—to refuse to award damages on such an infirm basis.

Entertainment USA attempts to explain away the errors in Chau Nguyen's damages estimate by reference to a pretrial discovery dispute it lost. Moorehead produced some pre-2013 account records in Adobe Portable Document Format (PDF) files instead of in spreadsheet form, making Chau Nguyen's task more difficult. See Dkt. 72. On appeal, however, the parties agreed that this discovery dispute about the file format of document production actually pertained not to Verizon activations and upgrades, but instead to satellite television services not relevant to this appeal. Even if the file format dispute were relevant, Entertainment USA had every opportunity to present an accurate estimate of damages. As the district court wrote in rejecting the plaintiff's request for an accounting:

> This court held several hearings, issued 6 separate written rulings on discovery-related motions, issued a 47-page summary judgment order, and conducted a 3-day bench trial on [Entertainment USA's] complaint for damages, with this 40-page opinion setting forth findings of fact and conclusions of law. The trial record doesn't suggest that Moorehead produced anything short of what it was ordered to do in discovery … .

2017 WL 3432319, at *17.[3]

---

[3] There is yet another problem with Entertainment USA's expectation that the district court re-engineer its damages estimate—the credibility of the estimator. In two incidents in the course of discovery, Chau Nguyen

Of course, in a case with multiple disputed legal interpretations, Entertainment USA could not have predicted in advance precisely how the district court would rule on liability. It needed to plan accordingly and present its evidence in a format that would allow reliable adjustments. Yet Entertainment USA did not even attempt to present the district court with a damages estimate matching the court's liability findings. It did not file a motion to reconsider after the district court's post-trial ruling. Even on appeal, it was still unable to give this court such an estimate.

Motions to reconsider are not explicitly provided for in the Federal Rules of Civil Procedure or in this district court's local rules, but filing them is a common practice in many district courts in situations like this. (We have even reversed district courts on occasion for failing to grant them. See, e.g., *Terry v. Spencer*, 888 F.3d 890, 893–94 (7th Cir. 2018) (district court abused its discretion by misapprehending the law and substance of a motion for reconsideration).) In fact, Judge Miller ruled on at least three motions to reconsider in other cases in the six months leading up to his post-trial ruling. See *Patrick v. Cowen*, No. 3:14-CV-782 RLM, 2017 WL 993067 (N.D. Ind. Mar. 15, 2017); *Valley Forge Insur. Co. v. Hartford Iron &*

---

drew his trustworthiness into serious doubt. First, he "doctored an important email" regarding the payment of referral fees. 2017 WL 3432319, at *4. Second, Moorehead filed an affidavit from a former Entertainment USA dealer accusing Chau Nguyen of deliberately withholding documents in discovery. Chau's alleged plan was to "'punch' Moorehead's counsel 'in the face' with the documents at a later date." Dkt. 63–3 at 2. Chau responded with an affidavit of his own denying the statement, Dkt. 70–3, and the matter was dropped. Given both of these incidents in discovery, the district court was entitled to look skeptically at the assumptions underlying Entertainment USA's estimates.

*Metal, Inc.*, No. 1:14-cv-6 RLM-SLC, 2017 WL 1546277 (N.D. Ind. Apr. 28, 2017); *Brown v. Biomet Orthopedics, LLC*, No. 3:14-CV-1470 RLM-MGG, 2017 WL 2684856 (N.D. Ind. Jun. 22, 2017). In one such order, the judge noted the availability of Rule 59(e) motions to correct a judgment within 28 days. *Valley Forge*, 2017 WL 1546277 at *1, citing Fed. Rule Civ. Pro. 59(e). He correctly observed that motions to reconsider exist to spare parties and courts unnecessary appeals. *Id.*, quoting *Russell v. Delco Remy Div. of Gen. Motors Corp.*, 51 F.3d 746, 749 (7th Cir. 1995). Perhaps the district court might have been persuaded by a responsive and reliable damages estimate that fit its findings of liability, and perhaps the plaintiff would have been satisfied with that result. But we cannot know since Entertainment USA decided to invoke our clear-error review instead.[4] Since the district court did not make an error, we affirm its judgment. Regardless of the scope of potential liability under the referral agreement, Entertainment USA did not show the district court that it was entitled to any recovery.

C. *Equitable Accounting*

The plaintiff's failure to prove its damages with reasonable certainty also shows why its request for an equitable accounting must fail. Because this was a request for an equitable remedy, we review its denial by the district court for an abuse of discretion. *ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*, 353 F.3d 541, 544–45 (7th Cir. 2003), citing *EEOC v.*

---

[4] If Entertainment USA had presented a responsive, reliable, and updated damages estimate to the district court and been denied, it could have sought review of that decision for an abuse of discretion. *Selective Insur. Co. of South Carolina v. City of Paris*, 769 F.3d 501, 507 (7th Cir. 2014) ("We review denials of motions for reconsideration brought under Rules 59(e) and 60(b) for abuse of discretion."). But that did not happen here.

*Laborers' Int'l Union of N. Am., AFL-CIO, Local 100*, 49 F.3d 304, 307 (7th Cir. 1995); see also *Lily, Inc. v. Silco, LLC*, 997 N.E.2d 1055, 1076 (Ind. App. 2013) ("Generally, an action for an accounting is a proceeding in equity and is addressed to the sound discretion of the trial court."), citing *Atwood v. Prairie Village Inc.*, 401 N.E.2d 97, 100 (Ind. App. 1980), and 1 I.L.E. *Accounts and Accounting* § 1.

Under Indiana law, the main purpose of an equitable accounting is the "striking of a balance between parties in a fiduciary relationship … and enforcing payment of the difference, if any, to the party entitled thereto." *Atwood*, 401 N.E.2d at 100 (citations omitted). We will not find its denial to be an abuse of discretion where the "amount of damages is neither difficult nor impossible to measure," and where the accounting information "could and should have been revealed through discovery." *Kempner Mobile Electronics, Inc. v. Southwestern Bell Mobile Sys.*, 428 F.3d 706, 715 (7th Cir. 2005) (applying Illinois law)**;** see also *Kimes v. City of Gary*, 66 N.E.2d 888, 893 (Ind. 1946) (where parties have "equal knowledge or means of knowledge[,] neither party is entitled to require an accounting from the other"). Equitable accounting, in short, is generally not a proper remedy in a "garden-variety contract dispute." *Kempner Mobile Electronics*, 428 F.3d at 715.

Here, we know that Entertainment USA was not denied equal means of knowledge. Through the discovery process, it gained access to Moorehead's accounting records up to 2013 and then produced a damages estimate. That estimate was flawed, and its data sources and methods were too opaque for the district court to verify the estimate independently. Production of a flawed estimate, however, does not mean that an information asymmetry existed. It simply means that the

estimate as produced was not sufficient to support a damages award. Moreover, there was no fiduciary relationship between these parties. Arms-length contracts do not establish fiduciary relationships. See *Kimes*, 66 N.E.2d at 893 ("A mere creditor as such has no right to compel his debtor to account in equity in the absence of any trust relationship between them. The relation between the bondholders and the city is contractual and the city's liability, if any, is that of a debtor only and there is no trust relationship.") (citations omitted). Entertainment USA is not entitled to a second attempt at proving its damages through equitable accounting.[5]

*Conclusion*

There is no reason for us to wade into the many contractual interpretation arguments advanced by the parties

---

[5] At oral argument we raised the possibility that under the district court's duration analysis—that the referral agreement remained in force "as long as any referred location was producing activations," 2017 WL 3432319, at *6—Moorehead may have had an ongoing post-trial duty to pay referral fees in 2016 and beyond that an equitable accounting would reveal. Entertainment USA did not fail to "make the substantive argument" on this point in either the district court or on appeal, so the argument has not been forfeited. See *Dixon v. ATI Ladish LLC*, 667 F.3d 891, 895 (7th Cir. 2012), citing *Elder v. Holloway*, 510 U.S. 510 (1994), and *FDIC v. Wright*, 942 F.2d 1089, 1094–95 (7th Cir. 1991). However, given that an equitable accounting is a remedy left to the sound discretion of the trial court in the first instance, and given that Entertainment USA did not ask the district court to clarify the prospective implications of its ruling, we decline to reach that issue here. We do not express an opinion on this question beyond observing that the general rule in Indiana is that "a contract containing no specific termination date is terminable at will." See *City of East Chicago, Ind. v. East Chicago Second Century, Inc.*, 908 N.E.2d 611, 623 (Ind. 2009), citing *House of Crane, Inc. v. H. Fendrich, Inc.*, 256 N.E.2d 578 (Ind. App. 1970).

in this case regarding the scope of Moorehead's liability. Even if Entertainment USA were to prevail on them all, its gains would be merely academic since it failed to prove its damages with anything close to reasonable certainty. The judgment of the district court is

AFFIRMED.