In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 18-3149

SELECTSUN GMBH,

*Plaintiff-Appellant,*

*v.*

PORTER, INC., d/b/a THUNDERBIRD PRODUCTS,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:14-cv-215 — **Theresa L. Springmann**, *Chief Judge.*

———————————

ARGUED APRIL 2, 2019 — DECIDED JUNE 25, 2019

———————————

Before HAMILTON, BARRETT, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Contractual disputes can be messy and present many tangled knots. A year ago in a similar contractual dispute under Indiana law we observed that sometimes the harder questions can be avoided where the evidentiary record shows that the plaintiff "failed to prove its damages with anything close to reasonable certainty." *Entertainment USA, Inc. v. Moorehead Communications, Inc.*, 897 F.3d 786, 797 (7th Cir. 2018). This same observation and evidentiary

shortcoming resolves this appeal and leads us to affirm the district court's judgment against SelectSun GmbH in this contract and warranty dispute over whether the exhaust system on a $1 million yacht manufactured by Porter, Inc. complied with particular regulatory requirements imposed by the European Union.

**I**

**A**

Porter is an Indiana company that manufactures boats under the Formula and Thunderbird trade names. At the center of this dispute is a 40-foot Formula yacht custom manufactured by Porter for a German businessman and boat enthusiast, Erich Schwaiger. Only a general understanding of how the sale and underlying contract came about is necessary here.

In September 2012, Schwaiger attended a boat show in Friedrichshafen, Germany, and met Alfred Zurhausen, the owner of Poker-Run-Boats, one of Porter's international dealers of Formula boats. Impressed with a Formula display model, Schwaiger expressed interest in ordering a Formula yacht with supercharged engines and high-end accessories and furnishings. Shortly thereafter Zurhausen met Schwaiger in Munich to discuss these options and pricing in more detail. Those discussions culminated in Schwaiger, through one of his companies, executing a contract with Poker-Run-Boats on October 1, 2012. The yacht and a custom-built lift cost Schwaiger approximately $1 million. Porter, as the manufacturer, was not a party to the contract. The only parties were Poker-Run-Boats and (following a substitution) Schwaiger's company, SelectSun.

By its terms, the contract required the boat to be "CE certified," meaning authorized for operation in the European Union. Porter did not manufacture the boat to meet this specification, and the reason seems to be because of communications during the ordering process that Porter had with one of its domestic dealers, International Nautic. Based in Florida, International Nautic had worked with Poker-Run-Boats (the German dealer) to receive Schwaiger's order and, in turn, to transmit that order to Porter. The order conveyed by International Nautic called for the yacht to come with a switchable exhaust system, one that would allow the operator to choose to divert exhaust either above or below the water line. Exhaust diversion above the water line results in a boat operating with more noise. EU regulations, however, require exhaust expulsion below the water line. Porter caught this conflict and explained to International Nautic that the boat could not be both equipped with the switchable exhaust system specified in the original order and CE certified. In the end, and following dialogue on the issue, International Nautic authorized Porter to proceed with manufacturing the boat with the originally designed exhaust system. Apparently Schwaiger knew nothing of International Nautic's decision and therefore believed the yacht would come CE certified.

Schwaiger took delivery of the yacht in Germany in May 2013. He used the boat throughout much of the 2013 season in Europe. (It is not clear whether he did so believing the boat was CE certified or knowing that it was not.) During these first few months, Porter covered a series of minor warranty repairs at no charge to Schwaiger. By the end of August, however, Schwaiger appeared fed up with the yacht, complaining to Poker-Run-Boats of problems with the boat's engines, steer-

ing column, exterior gel coating, and interior furnishings. Rather than seek repairs, Schwaiger returned the yacht to Poker-Run-Boats with instructions to sell it. When the boat did not immediately sell, Schwaiger resorted to litigation.

B

In January 2014, Schwaiger's company SelectSun, the party to the contract with the German dealer Poker-Run-Boats, filed a complaint against Porter in federal court in New York. SelectSun amended its complaint a month later to add International Nautic, Porter's Florida dealer, as a defendant. On Porter's motion, the district court in New York then transferred venue to the Northern District of Indiana, where Porter is headquartered.

SelectSun's claims against International Nautic ended in a default judgment. This resulted from International Nautic shuttering its business in January 2015, and from there forward failing to participate in the litigation. Equally noteworthy is that Porter's German dealer, Poker-Run-Boats, ceased operations sometime after this litigation commenced. These developments left SelectSun with claims only against Porter as the manufacturer of the yacht.

Summary judgment resulted in a partial ruling in Porter's favor and SelectSun proceeding to trial on three particular claims. First, and recognizing that Porter did not sign the October 2012 contract, SelectSun nonetheless sought to hold Porter liable for breach of contract under a theory of agency based on apparent authority. Second, SelectSun highlighted the damage to the yacht that Schwaiger experienced during the 2013 season, as well as the absence of the boat being CE certified, as part of alleging that Porter had breached express and

implied warranties and likewise violated the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*. Third, SelectSun advanced a claim of unjust enrichment. In its amended complaint, SelectSun sought damages for the full purchase price of the yacht, the cost of the lift, and related financing costs—a total exceeding $1,000,000.

A four-day bench trial followed in the district court. SelectSun focused much of its evidence on matters of contract formation and, in particular, the facts pertinent to determining whether Porter could be held to the contract terms under agency principles of apparent authority. The trial court, for example, heard substantial testimony about Schwaiger's direct and indirect interactions with Porter personnel, other indications that Poker-Run-Boats (Porter's German dealer) and International Nautic (Porter's Florida-based dealer) acted with Porter's authority, and Schwaiger's expectations that the yacht would come CE certified.

As for damages, and in keeping with the award sought in its amended complaint, SelectSun (and by extension Schwaiger) approached trial in an all-or-nothing manner: it sought to recover either over $1 million (reflecting the full purchase price of the boat, the cost of the lift, and financing costs) or $0—nothing in between. Put differently, SelectSun, despite offering expert testimony about the cause of particular damage to the yacht, did not approach trial with a plan B to recover the specific costs associated with the damage the boat experienced during the 2013 season. Even more specifically, SelectSun offered no evidence of the value of the yacht at the time of trial, the costs to repair various items like the cracked gel coating and damaged appliances, or the cost to render the yacht CE certified.

For its part, Porter approached trial by offering evidence to explain why it did not manufacture the yacht to be CE certified. So, too, did Porter offer competing expert testimony to show that the damage the yacht sustained during the 2013 season was the product of misuse by Schwaiger. Porter also offered testimony that the yacht's exhaust system could be modified to be compliant with the requirements for CE certification for an estimated $2,000.

The district court entered judgment for Porter on each of SelectSun's claims. In a thorough opinion, Chief Judge Springmann determined that SelectSun's breach of contract claims failed because Porter neither was a party to the October 2012 contract nor could be bound to its terms by a theory of apparent authority. On the latter point, the district court reasoned that the course of dealing between the parties "would not cause a reasonable person, much less a sophisticated businessperson, to believe that Zurhausen was an agent of Porter." As to SelectSun's breach of warranty claims, the district court emphasized that Schwaiger's all-or-nothing approach to damages—insisting on recovering the full purchase price of the boat instead of the more discrete repair costs—left him outside of the scope of relief available under Indiana law. Finally, the district court rejected the unjust enrichment claim based on the finding that Porter received no benefit at Select-Sun's (or Schwaiger's) expense.

Before concluding the case, and as part of quantifying the amount of the default judgment against International Nautic, the district court invited SelectSun to "provid[e] evidence estimating the cost to replace the exhaust system to bring the Boat into compliance with EU standards." SelectSun responded not by supplying a cost estimate to bring the vessel

into compliance with EU regulations, but instead by summarily positing that it is "impossible to assess cost of repair for this Boat," because "this Boat cannot be made CE compliant and is a total loss."

## II

On appeal SelectSun devotes substantial effort to challenging the district court's determination that Poker-Run-Boats and International Nautic did not act with the apparent authority requisite to bind Porter to the October 2012 contract for the yacht. In much the same way, SelectSun spills meaningful ink arguing that it offered ample evidence to prove that Porter breached its express and implied warranties by failing to manufacture the watercraft to be CE certified. Along the way, in advancing both contentions, however, SelectSun devotes little to no attention to explaining what we see as a plain failure of proof under Indiana law—establishing damages to a reasonable certainty—that independently defeats both its breach of warranty and breach of contract claims against Porter. It is on this alternative ground that we affirm the district court's judgment in Porter's favor. See *Continental Ins. Co. v. M/V ORSULA*, 354 F.3d 603, 606 (7th Cir. 2003) (explaining that "[w]e may affirm a district court's judgment on alternate grounds found in the record").

Similar circumstances presented themselves in *Entertainment USA, Inc*. There we confronted a contract dispute under Indiana law regarding a customer referral agreement between a cell phone wholesaler, Entertainment USA, and Moorehead Communications, an agent for wireless service provider Verizon. See 897 F.3d at 789–90. The agreement required Moorehead to pay Entertainment USA a certain amount each time

its referrals resulted in a new activation of a cell phone contract. See *id*. After Moorehead stopped paying, Entertainment USA filed suit but then in the ensuing litigation, including ultimately at trial, never developed evidence (in the form of a traditional damages calculation or otherwise) of what Moorehead had paid and still owed in light of the precise breach at issue and terms and conditions of the governing agreement. Entertainment USA, the trial record showed, "presented a damages calculation [that] aligned with its broad theories of liability, but it did not present an estimate or evidence that could, with reasonable effort, be disaggregated and recalculated in accordance with the district court's much narrower bases for finding liability." *Id*. at 791. The evidentiary shortcoming left the district court without a reliable evidentiary basis from which to measure and assess damages. See *id*.

The failing mattered—and indeed proved dispositive—because, under Indiana law, a breach of contract claim requires showing the existence of a contract, the defendant's breach, and damages. See *id*. at 793 (quoting *Old Nat'l Bank v. Kelly*, 31 N.E.3d 522, 531 (Ind. Ct. App. 2015)). The burden for establishing damages fell squarely on Entertainment USA, and the company was required to do so with evidence at trial "proving with reasonable certainty the damages which he incurred." See *id.* (quoting *Indiana Bell Tel. Co. v. O'Bryan*, 408 N.E.2d 178, 183 (Ind. Ct. App. 1980)). But "Entertainment USA's presentation of damages fell well short" of the evidentiary threshold—despite the district court's offering multiple opportunities to do so, the company never presented an estimate of damages that aligned with Moorehead's actual liability. See *id.* at 794. And because this failure of proof on damages was fatal, we stopped short on appeal of wading into the merits of Entertainment USA's challenge to the finding of a

breach of contract, emphasizing that "[i]t is not always necessary to march through this entire process if a single issue proves to be dispositive." *Id*. (quoting *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 473 (7th Cir. 2002)).

We chart the same course here. Substantial complexity accompanies SelectSun's challenges to the district court's rulings. Take, for example, the apparent authority question and, specifically, whether the trial evidence showed that Porter was bound to the October 2012 contract by virtue of particular actions the company took to allow Schwaiger to reasonably believe that the German dealer (Poker-Run-Boats) was Porter's agent. See *Rogers v. Sigma Chi Int'l Fraternity*, 9 N.E.3d 755, 764 (Ind. Ct. App. 2014) (delineating the parameters of apparent authority). The district court answered the question not only by analyzing the particulars of phone calls between the parties, Formula's marketing materials, and other aspects of the transaction, but also by making the related legal determination that only events before the contract signing date were relevant. While the district court's conclusion that no apparent authority existed has much to support it in the record, SelectSun has lodged a detailed, multipronged challenge to that conclusion on appeal, including by contending the court committed legal error by limiting its focus to interactions before the execution of the contract. The parties' briefing on these factual and legal issues is extensive.

All of this is avoidable, though, because regardless of the answers we would come to, the evidence presented by SelectSun at trial falls well short of its burden in proving damages on either its breach of warranty or breach of contract claims. The governing principles under Indiana law are straightfor-

ward. Indiana warranty law required SelectSun to present evidence of damages as to the cost of repairing the boat, replacing it, or proving its fair market value. See *Irmscher Suppliers, Inc. v. Schuler*, 909 N.E.2d 1040, 1050 (Ind. Ct. App. 2009). Likewise, Indiana contract law compelled SelectSun to offer at trial a reasonable calculation of damages resulting from the breach that was "supported by evidence in the record" and not "the mere basis of conjecture or speculation." *R & R Real Estate, Co., LLC v. C & N Armstrong Farms, Ltd.*, 854 N.E.2d 365, 370–71 (Ind. Ct. App. 2006).

Yet recall how SelectSun approached damages at trial, taking the position that the only appropriate award was not to recover specific necessary repairs to the yacht, but instead to return the vessel's purchase price as well as the financing costs and the cost of the lift—totaling approximately $1 million. SelectSun, in short, insisted the yacht was worth $0—literally worthless, not even retaining scrap value—absent the CE certificate called for by the contract.

There is more. At trial a Porter representative testified that the yacht's exhaust system could have been made compliant with EU regulations for an estimated $2,000. The district court credited this testimony as part of finding that any warranty damages would not exceed that estimate, and having presented no contrary estimate, SelectSun had no evidentiary ground to stand on to challenge the finding as clearly erroneous.

On this evidentiary record, we conclude that SelectSun did not meet its burden of proving damages to a reasonable certainty on either its breach of contract or warranty claims. Not only did SelectSun decline to present affirmative evidence as to the cost of specific damage or the current value of the boat,

it failed to rebut Porter's evidence that the boat could be made CE compliant for only $2,000. While Indiana law affords some flexibility in proving damages, a plaintiff must come forward with an estimate rooted in evidence and demonstrated to a reasonable certainty. See *Stoneburner v. Fletcher*, 408 N.E.2d 545, 550–51 (Ind. Ct. App. 1980); see also *Indiana Bell Tel. Co.*, 408 N.E.2d at 183 (explaining "the party asserting the breach has the burden of proving with reasonable certainty the damages which he incurred"). Against this standard and on this factual record, SelectSun failed to carry its burden in demanding a return of the yacht's entire purchase price.

## III

A failure of proof likewise plagued SelectSun's claim of unjust enrichment. Under Indiana law, SelectSun needed to show that it conferred a benefit upon Porter, expected payment in return, and yet received none—yielding an unjust result. See *Neibert v. Perdomo*, 54 N.E.3d 1046, 1051 (Ind. Ct. App. 2016). The district court found that the trial evidence demonstrated that this case was a poor fit for recovery on a theory of unjust enrichment. Porter received no benefit, much less unjust enrichment, by receiving partial payment for the yacht it manufactured and then delivered to Schwaiger. Nor did Porter bear any responsibility for, or receive any benefit from, the financing costs or price of the boat lift. We cannot say these conclusions reflect any error of fact or law.

For these reasons, we AFFIRM.